UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.  1:18-CV-20324-UNGARO/O'SULLIVAN

ELIZABETH AMY, as parent,
natural guardian, and next friend
of WESLEIGH AMY, a minor,

      Plaintiff,

v.

CARNIVAL CORPORATION, *etc.*

      Defendant.

_____/

**PLAINTIFF'S RESPONSE TO DEFENDANT'S**
**OMNIBUS MOTION IN LIMINE [D.E. 58]**

COMES NOW the minor plaintiff, Wesleigh Amy, by and through her mother and next friend, and their undersigned counsel, and respectfully responds to defendant CARNIVAL's Omnibus Motion *In Limine*  [D.E. 58] (hereafter "MIL") as follows:

## I.      INTRODUCTION

This diversity maritime negligence case against CARNIVAL arose on June 13, 2016 when 3-year-old WESLEIGH AMY passed *through* or *over* an unprotected open-course guardrail on starboard Deck 14, forward, on the *M/S Carnival Liberty* (*Fig. 1* below) and fell to the hard deck below.[1] See *Cmplt.*, ¶¶1, 21, 23 [D.E. 1]   She sustained, *inter alia*, a displaced skull fracture on the right side of her head, impact to her brain, and intracranial bleeding (inside the right side of her skull).[2]

---

[1] Will Amy depo., p. 31 (Wesleigh went through the guardrail) [D.E. 56-3]; and E. Burgos depo.,
  p. 12  (went over) [D.E. 56-2]
[2] Mohanty, MD depo., p. 38 [D.E. 56-10](also attached as **Exh. 10 hereto**)

**Fig. 1:**



Wesleigh is at the far left in the photo (*Fig. 2*) below - with her father and 5 siblings – taken by her

mother on the *Liberty* not long before the subject incident.

**Fig. 2:**



Wesleigh Amy's mother, Elizabeth Amy, as the child's "next friend," filed a two-count maritime negligence complaint against Carnival.[3]  Count I claims Wesleigh's damages and Count II claimed the mother's own individual damages for the child's medical expenses.  The Court later dismissed the mother's individual claim for the minor's medical expenses (Count II) because the same claim was included in Count I (the minor's own claim). [D.E. 12]

 Count I (the minor's claim) charges, *inter alia,* that the defendant negligently "specified... maintained and/or tolerated outdoor railings aboard the subject vessel...that did not comply with ...safety regulations, codes, and industry practices in that the railings could be climbed by small children and/or had openings of sufficient width to allow small children to pass through and fall to a lower deck." *Complaint.*, ¶¶20, 24 [D.E. 1]

CARNIVAL has filed an "Omnibus Motion *In Limine*" [D.E. 58] that seeks to exclude thirteen (13) items of evidence and/or testimony.  Items 4-7 deal with possible testimony by the minor plaintiff's mother, Elizabeth Amy, that we do <u>not</u> plan to adduce from her at trial (except for her first-hand observations of some of the family's activities on Deck 14 just before the fall).  Item 8 seeks to limit eyewitness testimony from the minor's father – who did not see her get past the guardrail in question.  He will <u>not</u> testify as to how the child got past the guardrail (because he did not see it); but he did see the child falling out of the corner of his left eye, which should be allowed.

For the reasons that follow, the balance of CARNIVAL's motion should be denied.

---

[3] Under common law, a child's overall claim for personal injuries can be, and traditionally is, brought by a "next friend" - usually a parent (as in the present case).  See *Wilkie v. Roberts,* 109 So. 225, 227 (Fla. 1926).  The real party in interest remains the minor, however, except in regards to separate claims brought by a parent for his or her own, individual damages.  See *Yordon v. Savage*, 279 So.2d 844, 846 (Fla. 1973)

## II.    ARGUMENT

### A.  Non-binding Safety Standards and Advisories that Limit Spaces Between Courses to 4" (MIL., pp. 2-4 [D.E. 58])

Count I (the minor's claim) charges, *inter alia,* that the defendant negligently "specified… maintained and/or tolerated outdoor railings aboard the subject vessel…that did not comply with …safety regulations, codes, and industry practices in that the railings could be climbed by small children and/or had openings of sufficient width to allow small children to pass through and fall to a lower deck." *Complaint.*, ¶¶20, 24 [D.E. 1]

Carnival insists that it is sufficient and somehow dispositive on this point that the subject guardrail complies with the **1966** International Convention on Load Lines, Ch. 25 ("**Protection of the Crew**") which allows spaces between guardrail courses to be up to 15 inches. [D.E. 47-10] (The Load Lines Convention also applies equally to passenger and non-passenger vessels alike, such as tankers and freighters - which carry no small children).

By contrast, U.S. Coast Guard regulation, 46 CFR 116.900(F)(a)(1)(3), §6.2.2.4.5.7 of NFPA-301 ("Code for Safety to Life From Fire on Merchant Vessels")(2001)[D.E.58-1], and §1003.2.12.2 of the International Building Code (2000) [D.E. 58-2] all recommend that spaces between open-course guardrail courses not allow a 4-inch sphere to pass through (to protect small children).[4]

Carnival's corporate deponent conceded that having 4-inch spaces between the courses of the subject guardrail would not violate the 1966 Convention on Load Lines, Ch. 25 ("Protection of the Crew")(that allows spaces between guardrail courses *up to* 15 inches).[5]

---

[4] Fore depo., pp. 47-48, 54  [D.E. 58-3](also attached as **Exh. 2 hereto**)
[5] Carnival FRCP 30(b)(6) depo., pp. 60-61 [D.E.. 56-4](also attached as **Ex. 4 hereto**)

Carnival, for years, has had actual knowledge of these safety advisories that recommend limiting guardrails spaces to 4 inches (to protect small children).[6] Ben Clement, Carnival's own current Senior Vice-President of Shipbuilding, testified in the present case that Carnival both knew of §1003.2.12.2 ("Opening Limitations") of the International Building Code ("*Open guards shall have balusters or ornamental patterns such that a four-inch diameter sphere cannot pass through any opening...*")(the same as in 46 CFR 116.900(F)(a)(1)(3), and §6.2.2.4.5.7 of NFPA-301 (2001); **and began implementing** that **very "guidance" on new Carnival vessels in the mid-2000s (***i.e.***, around the time the** *Liberty* **was launched)**.[7]

Judge Lenard, in *Holderbaum v. Carnival Corp.*, 87 F.Supp. 3d 1345 (S.D. Fla. 2015)(denying summary judgment and expressly referring in part to NFPA-301- which Carnival here asserts is irrelevant) common-sensibly held that a vessel operator's knowledge of voluntary, non-binding safety standards and advisories from respected national and international safety organizations amounts to constructive notice of the potential dangers resulting from ignoring such advice; **and is also relevant to the** **standard of care**. 87 F. Supp. 3d at 1352, 1355. Judge Lenard's holding in *Holderbaum* is now the prevailing view on this topic in this jurisdiction. See *Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1282-83 (11th Cir. 2015); and *Cook v. Royal Caribbean Cruises Limited*, 2012 WL 1792628 *3 (S.D. Fla., May 15, 2012)(citing, with approval, *Donlan v. Gluck Grp., LLC*, 2011 WL 6020574 *6 (D.N.J., Dec. 2, 2011)(knowledge of

---

[6] Carnival FRCP 30(b)(6) depo. pp. 87-93, 210-11, 216 [D.E. 56-4](also attached as **Exh. 4 hereto**)
[7] Clement depo., pp. 67-69, 153-154 [D.E. 56-6](also attached as **Exh. 3 hereto**)

safety standard put defendant on constructive notice of the potential danger of non-compliant stairs)).

Carnival asserts that both it and this court should ignore the safety advisories regarding 4-inch guardrail spaces enunciated in 46 CFR 116.900(F)(a)(1)(3), NFPA-301 §6.2.2.4.5.7 [D.E. 58-1] and International Building Code §1003.2.12.2 [D.E. 58-2] just because Carnival baldly asserts that these advisories (which impact the safety of small children) don't expressly apply to *foreign-flagged* cruise ships (both the CFR in question *and* NFPA-301 expressly apply to passenger vessels – which the *Liberty* indisputably is).  MIL. p. 4 [D.E. 58] This begs the question of whether a cruise line common carrier may exempt itself from observing otherwise apt safety advice from recognized safety organizations by the simple dodge of registering its vessels in a foreign country.

Carnival cites to language in NFPA-301 that it "is not intended for application *in addition to* Safety of Life at Sea (SOLAS) requirements to vessels in international trade." MIL, p. 2 [D.E. 58] (emphasis added). Carnival leaves out that SOLAS regulations, unlike the 1966 Convention on Load Lines, Ch. 25 ("Protection of Crew"), *have no* "requirements" for guardrail spaces.[8]

In any event, the Eleventh Circuit has now made clear that such hyper-technical objections *go to the weight* and not the admissibility of topical, non-binding voluntary safety standards.  In *Sorrels v. NCL (Bahamas) Ltd*., 2013 WL 6271522 *6 (S.D. Fla., Dec. 4, 2013), the district court granted the carrier a summary judgment after accepting the defendant's bald assertion (similar to Carnival's here) that "[t]he ASTM and OSHA materials cited by [plaintiff's expert] discuss general safety standards for workers aboard ships and do not address the appropriate standards for passenger areas on cruise ships."  The Eleventh Circuit reversed this finding, observing that "[a]

---

[8] Fore depo., p. 132  [D.E. 58-3](also attached as **Exh. 2 hereto**)

deck constructed of a single material…cannot be designed to meet two COF standards – one for passengers and one for crew members – at the same time." *Sorrels v. NCL (Bahamas) Ltd.*, 796 F. 3d 1275, 1282-83 (11th Cir. 2015)

Carnival's argument here, that the 4-inch opening limitation "does not apply," is especially inapt given that Carnival itself has been applying that very "guidance" to its new vessels since just after the *Liberty* was launched (in 2005); but did not bother to retrofit the subject open-course guardrail on the *Liberty* – although feasible to do so. [9]

Carnival cites to Your Honor's pre-*Sorrels* opinion in *Whelan v. Royal Caribbean Cruises, Ltd.*, 2013 WL 5595938 (S.D. Fla., Aug. 12, 2013).   There, Your Honor determined that 3 of 4 standards asserted by the plaintiff were irrelevant to the condition in question. Your Honor rejected the fourth standard (*Guidelines for Stair Safety*) because (1) "[p]laintiff has not shown that *Guidelines* is evidence of custom within the maritime industry, let alone that it is evidence of ordinary practice among engineers and architects;" (2) "[p]laintiff does not marshal any testimony tending to show that Defendant or the designers of the subject single-step were familiar with the guidelines;" and (3) "Plaintiff has not alleged that decedent's injury resulted from defendant's failure to conform to fire safety standards."

These infirmities do not exist in the standards proffered by the plaintiff in the present case.   First, the 4-inch space advisories in 46 CFR 116.900(F)(a)(1)(3), NFPA-301 §6.2.2.4.5.7 (2001)[D.E. 58-1], and International Building Code §1003.2.12.2 (2000) [D.E. 58-2] expressly apply to open-course guardrails (such as the subject guardrail).   Second, there is clear evidence in the present case that this form of passive child protective

---

[9] Clement depo., pp. 67-69, 153-154 [D.E. 56-6](also attached as **Exh. 3 hereto**)

measure has been customary in the marine passenger carrier industry since at least the mid-2000s, **when Carnival itself began implementing that very "guidance"** on new Carnival vessels (*i.e.*, around the time the *Liberty* was launched; and 5-6 years <u>after</u> Disney Cruise Line, unlike Carnival, insisted that the same Italian shipyard company narrow the spaces between open-course guardrails on the *Disney Wonder* to protect small children).[10]   Third, there is testimony in the present record that the 4-inch space limit has long represented the ordinary practice among engineers and guardrail designers.[11] Fourth, unlike in *Whelan*, Carnival has been aware of the 4-inch "guidance" for over a decade.[12]

Finally this plaintiff (unlike Whelan) has alleged, and Carnival's corporate deponent (Ms. Vazquez) has conceded, that Wesleigh Amy would not have been able to pass through a 4-inch guardrail space.[13]   See *Complaint.*, ¶¶20, 24 [D.E. 1]   Ms. Vasquez and Mr. Clement (Carnival  SVP, Shipbuilding) both admitted that it was feasible to modify the subject guardrail during the decade the *Liberty* was in service – and under Carnival's exclusive control – prior to the subject incident on June 13, 2016.[14]

Cruise line defendants in cases of this nature always take great pains to remind us that they cannot be liable without "actual or constructive notice of the risk-creating condition, *at least where…the menace is one commonly encountered on land…*"   See *Chaparro v. Carnival Corp.*, 693 F.3d 133, 1336 (11th Cir. 2012)(emphasis added)

---

[10] Clement depo., pp. 67-69, 153-154 [D.E. 56-6](also attached as **Exh. 3 hereto**); Disney Cruise Line FRCP 30(b)(6) depo., pp. 14-15, 20, 22-23, 28 [D.E. 56-7](also attached as **Exh. 5 hereto**)

[11] Fore depo.pp. 77, 94-95 [D.E. 58-3](also attached as **Exh. 2 hereto**)

[12] Clement depo., pp. 67-69, 153-154 [D.E. 56-6](also attached as **Exh. 3 hereto**)

[13] Carnival FRCP 30(b)(6) depo., p. 193 [D.E. 56-4](also attached as **Exh. 4 hereto**)

[14] See *id.*, pp. 86-87, 98-99, 103-104; and Clement depo., pp. 116, 128-130, 132, 163-164 [D.E. 56-6](also attached as **Exh. 3 hereto**)

Thus, to be eligible for that protection in the present case, Carnival has to concede that the subject open-course guardrail (on a ship) is analogous to one on land. In any case, an open-course guardrail has the same safety function (and the same risks to small children – depending on how it is configured) whether it be on a passenger ship at sea or on a balcony at the local Holiday Inn Express.

No rule of law should entitle, let alone encourage, ocean carriers like Carnival to ignore relevant child safety standards and advice just because they may be equally apt ashore.

**B. Evidence Of Child Protections Built Into the Guardrails On the _Disney Wonder_. (MIL., pp. 4-7 [D.E. 58])**

In the present case, the jury will be instructed that:

> "Negligence" is the failure to use reasonable care. Reasonable care is that degree of care that a reasonably careful person would use under like circumstances. Negligence may consist either in doing something that a reasonably careful person would not do under like circumstances, _or in failing to do something that a reasonably careful person would do under like circumstances_.   (emphasis added)

_Pattern Civ. Jury Instr. 11th Cir. (2005)_

Thus, in _Brigham Young University v. Lillywhite_, 118 F. 2d 836 (10th Cir. 1941), the court determined that evidence of precautions taken by others bears on a defendant's standard of care. This is one reason we developed evidence in the present case that Disney Cruise Line, unlike Carnival, ordered the Fincantieri shipyard company in Italy to incorporate a host of child protective measures into the exterior guards on the _Disney Wonder_ (6 years before the _Carnival Liberty_ was completed by Fincantieri).[15]  Another reason is that Carnival's corporate witness, Ms. Vasquez, repeatedly asserts that a cruise carrier customer of a shipyard is the tail, not the dog, in

---

[15] Disney Cruise Line FRCP 30(b)(6) depo., pp. 14-15, 20, 22-23, 28 [D.E. 56-7](also attached as **Exh. 5 hereto**).

the relationship; and that consequently Carnival had to accept the subject open-course guardrail as presented by the shipyard.[16]  That is demonstrably false, given that Disney Cruise Line was able to cause the same Italian shipyard company (Fincantieri) to install child-protected guardrails on the *Disney Wonder*.[17]  In summary, Disney Cruise Line exercised reasonable care to protect its future small children passengers on the *Wonder*; <u>but Carnival did not do so on the *Liberty*</u> (either during construction or during the ensuing decade before the subject incident).

Carnival argues that this evidence will "confuse the jury and [be] unduly prejudicial to Carnival." MIL, p. 4 [D.E. 58]  We agree that this evidence is *highly* "prejudicial" to Carnival (which is why we are offering it; and is why Carnival wants the court to sanitize the case by precluding it); however, "[t]here is a difference between unfairly prejudicial evidence, which may be excluded under Rule 403, and evidence that is 'simply adverse to [an] opposing party.'" *Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1285 (11th Cir. 2015).  Carnival has not explained what would "confuse" the jury about a fairly simple negligence concept, namely, that Carnival failed "*to do something that a reasonably careful person* [*i.e.*, Disney did] *do under like circumstances*."  See *Pattern Civ. Jury Instr. 11th Cir. (2005)*

### C.  <u>Expert Testimony Regarding Vigilance of Caregivers As A Means to Avert Falls By Small Children</u>. (MIL., pp. 7-8 [D.E. 58])

Carnival's mantra up to now has been that the subject incident was 100% due to a failure of Wesleigh Amy's parents to constantly have eyes on her (along with their other 5 children).[18]

Therefore, we asked plaintiff's expert engineer, Mr. Fore, whether a reasonable design and maintenance approach to such an open-course guardrail on a passenger vessel would forgo

---

[16] Carnival FRCP 30(b)(6) depo., pp. 52, 55, 62-63, 75, 142 [D.E. 56-4](also attached as **Exh. 4 hereto**)

[17] Disney Cruise Line FRCP 30(b)(6) depo., pp. 14-15, 20, 22-23, 28 [D.E. 56-7](also attached as **Exh. 5 hereto**)

[18] Carnival FRCP 30(b)(6) depo., pp. 33, 185-87

proactive, passive child protection measures in favor of exclusive reliance upon caregiver vigilance to safeguard its small children passengers (*i.e.,* Carnival's approach to the subject guardrail). To answer this question, Mr. Fore accessed scientific studies that demonstrate that caregiver vigilance is an unreliable means to avert falls by small children; and he also made observations of how several small children and their caregivers interacted with guardrails during a cruise on the *Disney Wonder*.[19] Mr. Fore concluded that open course guardrails attract some small children; and that sole reliance on "variable" caregiver vigilance is not a reasonable or effective alternative to incorporating robust, passive child protections into guardrails.[20]

Carnival did not mount a *Daubert* challenge to this evidence and testimony. (Neither party filed a *Daubert* motion by the court's deadline, thereby waiving any objections to experts based upon qualifications, methodology, or helpfulness). Instead, Carnival here argues only that the foregoing evidence "related to parent-child interaction and parental vigilance should be excluded because it will confuse the jury or unduly prejudice Carnival." MIL, p. 8 [D.E. 58]

Carnival acknowledges, however, that under FRE 401, evidence is relevant if it has a tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action. MIL, p. 6 [D.E. 58]

Here, Carnival has introduced a defense issue, namely, that sole reliance on caregiver vigilance is an effective and reasonable way to prevent small children from falling from heights.[21] This assertion, however, is contradicted by both the caregiver studies accessed and cited by Mr. Fore and his by own observations of how small children and their caregivers interact with guardrails during an actual cruise (on the *Disney Wonder*).

---

[19] Fore sworn report, pp. 8-9, 15-16 [D.E. 59-8](also attached as **Exh. 1 hereto**)
[20] *Id*., p. 21
[21] Carnival FRCP 30(b)(6) depo., pp. 33, 179, 184-85 [D.E. 56-4](also attached as **Exh. 4 hereto**)

Carnival does not explain its bald assertion that this evidence will somehow be "unduly prejudicial" or "confusing" to the jury.  See *Sorrels v. NCL (Bahamas) Ltd*., 796 F.3d 1275, 1285 (11th Cir. 2015) ("There is a difference between unfairly prejudicial evidence, which may be excluded under Rule 403, and evidence that is 'simply adverse to [an] opposing party.'").  To the contrary, this evidence is directly relevant to and rebuts a central issue introduced *by the defendant*; and its exclusion will unfairly ensure that the defendant, its counsel, and witnesses will the only speakers heard by the jury on this topic.

**D.  Testimony From Elizabeth Amy About How The Fall Occurred. (MIL., pp. 8-9 [D.E. 58])**

Elizabeth Amy did not see the fall occur; so we will offer no testimony from her about how the fall occurred.

**E.  Testimony From Elizabeth Amy About How she, Her Children, and Husband Were Positioned at The Railing At the Time of the Fall. (MIL., p. 9 [D.E. 58])**

Elizabeth Amy did see, and offered testimony, about certain activities of the family and their locations on Deck 14 prior to the fall, including at the rail.[22]  For example, she testified that she saw Wesleigh clinging to the left leg of her father (at the rail) prior to the fall.[23]  She should not be precluded from testifying as to what she actually saw.

**F.  Testimony From Elizabeth Amy About Other Similar Incidents on Carnival Ships. (MIL., p. 9 [D.E. 58])**

We will offer no such testimony from Elizabeth Amy.

**G.  Testimony From Elizabeth Amy About How Disney Protects Children On Its Ships. (MIL., p. 9 [D.E. 58])**

We will offer no such testimony from Elizabeth Amy.

---

[22] Elizabeth Amy depo, pp. 13-27 [D.E. 58-5](also attached as **Exh. 6 hereto**)
[23] *Id.*, pp. 20-21

**H.  Testimony From Wade Amy About How The Fall Occurred.  (MIL., p.  10 [D.E. 58])**

Wade Amy (Wesleigh's father) did not see her get past the subject guardrail (*i.e.*, through or over it).  So we will offer no testimony from him speculating about that specific topic; however, Mr. Amy did see Wesleigh in the process of falling head first (out of the corner of his left eye).[24]  He should not be precluded from testifying as to what he actually saw, including where she hit the deck below (if he saw that).

**I.  Testimony From Dr. Mohanty (Neurosurgeon Who Assessed Wesleigh in Galveston) (MIL., p.  10 [D.E. 58])**

Carnival wants to preclude deposition testimony from Dr. Mohanty "that plaintiff in particular will suffer from learning disabilities or seizures in the future."  MIL, p. 10 [D.E. 58]

We will present no testimony from Dr. Mohanty about the fact that Wesleigh is at an increased risk of learning disabilities in the future as a result of sustain a traumatic brain injury (TBI); however, Dr. Mohanty, *in response to a question from the defense lawyer*, testified that the severe nature of Wesleigh Amy's head injury (skull fracture, intracranial bleeding, brain impact) puts Wesleigh at an increased risk of delayed-onset seizures well into adulthood.[25]  If Dr. Mohanty had responded that there was no such increased risk, the defendant would be embracing that testimony rather than trying to exclude it.  Suffice it to say, history-taking, examination, diagnosis, *and prognosis* are what doctors like Dr. Mohanty do in the regular course of treatment of a patient.   Carnival asked Dr. Mohanty the question about prognosis, got an answer it didn't like (increased risk of delayed-onset seizures); and should have to live with it.

---

[24] Wade Amy depo., pp. 30, 113 [D.E. 48-1] (also attached as **Exh. 7 hereto**)
[25] Mohanty depo., pp. 41-42 [D.E. 56-10](also attached as **Exh. 10 hereto**)

**J.** **Testimony From Dr. Swischuk (Neuroradiologist Who Read Wesleigh's Imaging in Galveston) (MIL., p. 11 [D.E. 58])**

Dr. Swischuk should be able to testify to, and interpret, everything he actually saw on Wesleigh Amy's imaging at University of Texas Medical Branch (UTMB) in Galveston, including her skull fracture, intracranial bleeding, and the condition of her sinuses (as shown on scans).  Dr. Swischuk is not an ears-nose-throat specialist (ENT); and we have no plans to offer ENT testimony from Dr. Swischuk (other than his opinion at the time – based upon what he saw in the imaging - that Wesleigh needed to see one).

**K.** **Testimony From Robert Cullen, MD (former Chairman of the Dept. of Pediatric Neurology at Miami Children's Hospital, 1974-2002) (MIL., pp. 11-12 [D.E. 58])**

Dr. Cullen examined Wesleigh, reviewed her medical records and applicable medical literature; and has reported and testified that Wesleigh Amy sustained a "complicated mild traumatic brain injury" consisting of (1) a skull fracture; (2) intracranial bleeding; (3) cellular-level brain damage (including to the frontal lobes) that is currently causing microcephaly (smaller than expected skull size); (5) post-traumatic vertigo; and (6) frontal lobe cognitive and behavioral deficits (including currently-diagnosed deficits in processing speed and fluid reasoning; and attention deficit hyperactivity disorder (ADHD).[26]  Dr. Cullen explained how Wesleigh's direct head impact resulted in a "coup-contra-coup effect" that involved her frontal lobes.[27]  Dr. Cullen testified that the type of head and brain insult sustained by Wesleigh Amy was fully capable of producing cellular-level damage to the frontal lobes that causes delayed-onset of structural such

---

[26] Cullen depo. pp. 24, 31, 45, 59, 62, 72-74, 97-98, 106-07 [D.E. 58-9] (also attached as **Exh. 8 hereto**)

[27] *Id.*, pp. 129-30, 140-141

as microcephaly and behavioral disorders such as ADHD - <u>which Wesleigh Amy is experiencing</u> <u>right now</u>.[28]

Dr. Cullen then explained that the nature and severity of Wesleigh's initial brain insult puts her at an increased risk of delayed-onset consequences (*e.g.,* ADHD and post-traumatic seizures well into adulthood - as demonstrated in medical journals and studies disclosed to the defendant).[29] As previously stated, she is already experiencing some of those delayed-onset consequences.[30]

Carnival did <u>not</u> mount a *Daubert* challenge to this evidence and testimony.  (Neither party filed a *Daubert* motion by the court's deadline for such motions, thereby *waiving* any objections to experts based upon qualifications, methodology, or helpfulness).

Carnival here seeks to preclude Dr. Cullen only "from testifying about alleged frontal lobe problems and potential associated long-term effects of them," which Carnival asserts is "speculative."  MIL., p. 11 [D.E. 58]   However, Dr. Cullen is hardly speculating.  According to Dr. Cullen, Wesleigh <u>currently has</u> related, delayed-onset microcephaly and post-traumatic vertigo, and has ADHD and demonstrated cognitive deficits, *e.g.*, in processing speed and fluid reasoning (which are signs of frontal lobe damage) - to a reasonable degree of medical probability.[31]  According to Dr. Cullen, Wesleigh will likely suffer these current difficulties well into adulthood.[32]

---

[28] Cullen depo pp., 45, 59, 72-74, 96-99, 106-07, 140-41 [D.E. 58-9] (also attached as **Exh. 8 hereto**)
[29] *Id.*, pp. 72-74, 97-99, 114, 140-141, 144-45, 150-53
[30] *Id.*, pp., 45, 59, 72-74, 96-99, 106-07, 140-41
[31] *Id.*, pp. 24, 45, 59, 72-74, 96-99, 106-07
[32] *Id.*, pp. 150-51

**L.   Testimony From Craig Lichtblau, MD (Board-certified Specialist in Physical & Rehabilitative Medicine) (MIL., pp. 12-13 [D.E. 58])**

Dr. Lichtblau reviewed Wesleigh Amy's medical records, examined her, and conducted an exhaustive review of recent, current, peer-reviewed and published medical literature and studies. Dr. Lichtblau, in consultation with Dr. Cullen, then created a future care plan to address Wesleigh's current, related diagnoses (*e.g*., ADHD); and to provide for periodic checkups to early-catch other related, delayed-onset conditions (*e.g.,* seizures, decreased school performance, Parkinson's disease, ALS, dementia).[33]   The literature Dr. Lichtblau demonstrates that such delayed-onset conditions are anticipated outcomes from the exact type of head/brain insult experienced by Wesleigh Amy (*i.e.,* a "complicated mild traumatic brain injury").[34]  Dr. Lichtblau testified that such delayed-onset complications are in the "probable" category for Wesleigh..[35]

Carnival did <u>not</u> mount a *Daubert* challenge to this evidence and testimony.  (Neither party filed a *Daubert* motion by the court's deadline for such motions, thereby *waiving* any objections to experts based upon qualifications, methodology, or helpfulness).  Carnival here only asserts that opinions about medical conditions that may arise in the future are "speculative."  MIL, p. 12 [D.E. 58]

This case is not like a toxic exposure case where the victim was exposed to toxins but has manifested no injury.  Here, Wesleigh Amy <u>has already suffered</u> demonstrable physical injuries which have already led to some delayed consequences.(*e.g.,* microcephaly, post-traumatic vertigo, and ADHD).[36]

---

[33] Lichtblau depo., pp. 23-24 [D.E. 58-10] (also attached as **Exh. 9 hereto**)
[34] *Id.*., pp. 29-31
[35] *Id.,* p. 31
[36] Cullen depo.,  pp. 24, 45, 59, 72-74, 96-99, 106-07 [D.E. 58-9](also attached as **Exh. 8 hereto**)

The fact that she is currently at an increased risk of other "probable" delayed consequences from her brain injury is relevant to her claim for future medical costs and damages. See, _e.g.,_ *Hagerty v. L&L Marine Services, Inc*., 788 F.2d 315, 319-320 (5th Cir. 1986)(approving cost of periodic checkups regarding increased-risk conditions); and *Ball v. Joy Technologies, Inc*., 958 F.2d 36, 39 (4th Cir. 1991)("A claim for medical surveillance is simply a claim for future damages.").

The court, in ruling on this objection, should consider that Wesleigh Amy has no other remedy for such future damages outside the present case; and procedurally cannot wait for the remaining "probable" future medical consequences to actually manifest. Ordinarily, maritime cases are subject to a three-year statute of limitations, 46 U.S.C. 30106; however the same law permits passenger carriers like Carnival to contractually shorten the suit period to one (1) year – which every single carrier does. Obviously, once such a suit gets filed in this court (which Carnival's ticket designates as the sole forum), there is no way for a 5-year-old litigant like Wesleigh Amy to delay the process for years, let alone into adulthood, to add further clarity to her consequences from this horrific event.

**M.   Further Testimony From Frank A. Fore, P.E. (Engineer)** (MIL., p. 13 [D.E. 58])

We will not be asking Mr. Fore to weigh-in on the credibility of competing eyewitnesses who variously saw the minor plaintiff pass through or over the subject open-course guardrail. That is not a proper subject of expert testimony.

### III.    CONCLUSION

Except where the plaintiff is in agreement, as set forth above, Carnival's Omnibus Motion *In Limine* [D.E. 58] should be denied.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 28th day of September, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic filing generated by CM/ECF or some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

ERIKSEN LAW FIRM
2161 Palm Beach Lakes Blvd., Ste. 410
West Palm Beach, FL 33409-6611
Tel: 561-684-7612 (Main)
Fax:    561-533-8715
mde@travelaw.com
Attorney for Plaintiff

By: /s/  Michael D. Eriksen
        MICHAEL D. ERIKSEN
        Florida Bar No. 316016

18

## SERVICE LIST

*Amy v. Carnival*
CASE NO. 18-CV-20324-UNGARO
United States District Court, Southern District of Florida

Thomas A. Briggs, Esquire
tbriggs@maselaw.com
rcoakley@maselaw.com
Curtis J. Mase, Esquire
cmase@maselaw.com
kfehr@maselaw.com
William R. Seitz, Esquire
wseitz@maselaw.com
filing@maselaw.com
carbelaez@maselaw.com
Mase Mebane & Briggs, P.A.
2601 South Bayshore Drive, #800
Miami, FL 33133
Tel: 305-377-3770
Fax: 305-377-0080
Counsel for Defendant
Service via CM/ECF Notice of Electronic Filing

Michael D. Eriksen, Esquire
mde@travelaw.com
linda@travelaw.com
caitlyn@travelaw.com
Eriksen Law Firm
2161 Palm Beach Lakes Blvd., Suite 410
West Palm Beach, FL 33409
Tel:     866-493-9902
Fax:     561-533-8715
Counsel for Plaintiff
Service via CM/ECF Notice of Electronic Filing